**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Julie Ortega,                                                        Case No. 3:11CV01734

                                Plaintiff

                v.                                                            **ORDER**

Wells Fargo Bank, N.A.,

                                Defendant

Plaintiff Julie Ortega (nee Bollenbacher), a residential mortgagor in Huron, Ohio, applied

for a home loan modification with defendant Wells Fargo Bank, N.A. under the Home Affordable

Modification Program (HAMP).[1] Defendant Wells Fargo is a financial institution and the servicer

of plaintiff's mortgage.

In May, 2009, plaintiff applied for a HAMP-assisted home modification loan through the

defendant. According to her complaint, she entered into a Trial Period Agreement (TPA) and

undertook to perform all requirements for the program, but the bank mishandled her application.

---

[1] HAMP is a federal program to help delinquent or precipitously-close-to-delinquent
mortgagees avoid foreclosure by giving incentives to banks to consider loan modifications.

1

Nonetheless, relying on assurances from the bank, she continued, at the bank's instruction, making payments. Those payments were, at the bank's instruction, for less than the amount of her monthly loan payments.

This arrangement continued until October, 2009. The bank then offered a Temporary Forbearance Agreement (TFA) to plaintiff, which she agreed to enter into. She again paid all requested amounts on time through December, 2009, the end of the TFA. Plaintiff's complaint then states that the bank instructed her to continue paying the monthly amount due under the TFA, with no indication of the status of her initial application for a HAMP loan modification.

In March, 2010, the bank ultimately awarded plaintiff a loan modification. Between February 10, 2010, and May 24, 2010, the bank charged to and then removed from plaintiff's account several late fees in accord with the TPA On May 26, 2010, the bank charged a $1,351.60 fee to plaintiff's account that persisted at least until the time of this suit's filing.

Plaintiff asserts claims for violation of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691, *et seq.*, breach of contract, intentional and negligent misrepresentation, promissory estoppel, unjust enrichment and conversion.

Jurisdiction exists under 28 U.S.C. § 1332.

Pending is defendant's motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Doc. 4]. For the reasons discussed below, the motion is granted in part and denied in part.

## Factual Background

Plaintiff refinanced her home in December, 2007, in favor of Union National Mortgage Company. She borrowed a principal amount of $214,000 at a fixed interest rate of six percent. The

total monthly payment was $1,675.89, with some variance for payment of certain escrow items. Shortly thereafter, defendant became the "servicer" of plaintiff's loan, collecting and applying her mortgage payments.

In late 2008, plaintiff's financial hardship began to impact her ability to make her mortgage payments. On January 22, 2009, she faxed a hardship letter to the bank explaining her situation. After plaintiff, at the banks' request, on March 30, 2009 returned a Financial Worksheet, the bank on May 2, 2009, sent a letter detailing its involvement in the HAMP program.

The bank's letter encouraged plaintiff to indicate, no later than June 1, 2009, whether she would enter defendant's HAMP program. Under the program, plaintiff would sign a TPA, wherein she would agree to make three payments of $1,518.95 (a $156.94 reduction in her base monthly payment) on June, July and August 1, 2009, with the TPA ending on September 1, 2009. Plaintiff was also required to send two signed copies of the TPA) and requisite income documentation.

As a part of the TPA, the bank agreed to "waive ALL unpaid late charges at the end of the trial period[,]" provided plaintiff fulfilled the terms of the trial period. [Doc. 1-1, at 53] (emphasis in original). The letter stated that "[a]ny past due amounts as of the end of the trial period . . . will be added to your mortgage loan balance." [*Id*.]. "As long as [plaintiff] compl[ied] with the terms of the Trial Period, [defendant] will not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started." [Doc. 1-1, at 55].

The letter also stated that "[defendant] will notify you if you do not qualify for this program." [*Id.*].

Plaintiff pursued a HAMP modification, and entered into a TPA. In relevant part, the defendant promised it would "send [plaintiff] a copy of this Plan if [she] qualif[ies] for the Offer,

3

or will send [her] written notice that [she] do[es] not qualify for the Offer." [Doc. 1-1, at 56]. Defendant agreed to keep payments received during the TPA in a non-interest bearing account until they totaled a full (now-delinquent) payment.[2] Defendant executed the TPA on June 21, 2009.

Plaintiff timely paid her obligations under the TPA by the first of June, July and August. Throughout August and into September, plaintiff contacted defendant to discover the status of her application. Defendant instructed plaintiff, on or about September 4, 2009, to make an additional $1,518.95 payment for September, which she in turn did. After further communication with defendant, plaintiff received instruction to and did submit a fifth $1,518.95 payment for October.

In mid-October, plaintiff received and entered into a TFA with defendant. The TFA instructed her to make three payments of $1,293.39 on the first of October, November and December. Plaintiff, having already made a $1,518.95 payment at the beginning of October, timely made the November and December payments. Plaintiff continued to inquire about the status of her modification. She received no definite answer from defendant.

Defendant instructed plaintiff to make another $1,293.39 payment for January, following the apparent termination of the TFA. On January 15, 2010, plaintiff wrote to defendant to inquire further about the status of her June, 2009, application. Defendant responded on January 27, 2010, waiving an unspecified fee[3] as a courtesy, and offering a variety of automatic withdrawal plans.

---

[2] The TPA was not a modification or suspension of the original mortgage obligation, but instead an agreement that plaintiff could incur a delinquency without additional penalty or fees other than the amount in arrears, and repay that amount through an altered mortgage agreement.

[3] According to the Customer Account Activity Statement for plaintiff's account, defendant charged her $64.15 on January 19, 2010 (four days after her letter), and then reversed the charge on January 27, 2010.

4

Defendant again instructed plaintiff to pay $1,293.39 in February. She did so on time. On February 9, 2010, defendant sent a letter to plaintiff, telling her that it was considering her application. The letter also stated the defendant needed further information from her to process the application. Plaintiff complied.

In March, 2010, defendant told plaintiff to skip that month's payment. On March 18, 2010, defendant notified plaintiff of its approval of a permanent loan modification to $1,470.74 per month, with a lower interest rate over the life of the mortgage.

Between January and May of 2010, the defendant repeatedly assessed late charges against the plaintiff. It later reversed those assessments, doing so for the last charge on May 24, 2010.

Between June, 2009, and May, 2010, defendant continued to apply plaintiff's payments only when she had paid enough to equal a full payment under the original 2007 mortgage. It applied her payments:

| Payment | Transaction Date | Effective Date | Amount |
|---|---|---|---|
| June 2009 | 07/29/09 | 06/29/09 | $1,731.01 |
| July 2009 | 08/10/09 | 08/05/09 | $1,731.01 |
| August 2009 | 09/09/09 | 09/04/09 | $1,731.01 |
| September 2009 | 10/13/09 | 10/12/09 | $1,731.01 |
| October 2009 | 11/05/09 | 11/04/09 | $1,731.01 |
| November 2009 | 01/05/10 | 01/02/10 | $1,731.01 |
| December 2009 | 02/09/10 | 02/02/10 | $1,686.87 |

In addition, defendant applied plaintiff's $1,815.17 payment for January, 2010, on May 12, 2010, with an effective date of March 23, 2010. It reversed on this charge on May 20, 2010 with the notation "Misapplication Rev. Long" beside it.

5

Defendant charged and reversed late fees four times between February 16, 2010, and May 24, 2010.

On May 25, 2010, a "Non Cash Adjustment" of $6,560.12 appeared on plaintiff's account. This apparently was the delinquent balance on her mortgage, added back onto her mortgage balance. On May 26, 2010, a "Corporate Advance Adjustment" appeared on plaintiff's account, leaving a fee balance of $1,351.60 through at least December, 2010. Plaintiff made her first regular payment on her modified mortgage on June 2, 2010, with an effective date of June 1, 2010, in the amount of $1,470.74.

Plaintiff subsequently filed the instant lawsuit, advancing the above mentioned claims.

### Standard of Review

A claim survives a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, U.S. , 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

A complaint is insufficient "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, *supra*, 129 S.Ct. at 1949 (citing *Twombly*, *supra*, 550 U.S. at 557) (internal quotation omitted).

I must "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Plaintiff, however, must provide "more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, *supra*, 550 U.S. at 555; *see also Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

### Discussion

> HAMP is ... designed to promote loan modification and other foreclosure prevention services. Under HAMP, individual loan servicers voluntarily enter into contracts with Fannie Mae, acting as the financial agent of the United States, to perform loan modification services in exchange for certain financial incentives. The servicer's obligations under HAMP are set forth in the HAMP Agreement, as well as in Program Guidelines established by the Department of the Treasury.

*Brown v. Bank of N.Y. Mellon*, 2011 WL 206124, *2 (W.D. Mich.) (quoting *Villa v. Wells Fargo Bank, N.A.*, 2010 WL 935680, *1 (S.D. Cal.) (citations omitted).

### 1. Equal Credit Opportunity Act

Plaintiff advances two theories for defendant's  ECOA liability, both under 15 U.S.C. § 1691(d). She argues that 15 U.S.C. § 1691(d)(1) and (d)(2) are independent provisions, each affording her separate rights. Section 1691(d)(1), she asserts, requires a creditor to "notify the applicant of its action on the application" within thirty days. *Id.* Section 1691(d)(2), she argues, places a different requirement on the creditor, requiring them to give notice of adverse action as defined by 12 C.F.R. § 202.2(c).

I agree with plaintiff. The statute's two sections require distinct actions. Under § 1691(d)(1), the bank must provide notice of any action, whatever that action may be.

Under § 1692(2), when a bank takes "adverse action" against an applicant, the must provide "a statement of reasons for such action" by either:

7

(A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

(B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

See *Coulibaly v. J.P. Morgan Chase Bank, N.A.*, 2011 WL 3476994, *16 (D. Md.).

Taken as separate requirements, the plaintiff asserts a plausible claim under (d)(1), but not under (d)(2).

### A. Thirty-Day Notice

The thirty-day notice requirement of 15 USC § 1691(d)(1) places a simple burden on a creditor: inform the debtor, whether potential or current, of your decision, whatever it may be. *Coulibaly, supra*, 2011 WL 3476994, at *16. Defendant argues that notice was given through the body of the TPA, and that plaintiff should have derived through negative inference that the lack of a finalized modification by September 1 was tantamount to a denial.

Taking the facts presented in the light most favorable to the plaintiff, it is entirely plausible that she never received notice, whether constructive or actual, of defendant's decision before March, 2010, and that defendant did not make a decision before March, 2010. Defendant kept plaintiff on her TPA payment schedule for two additional months past its stated termination date. It did so, moreover, with no indication it was no longer considering her for a modification. Defendant then agreed to enter the TFA with plaintiff for three months. Thereafter, it extended that agreement an additional two months. In March, 2010, defendant finally agreed to modify plaintiff's mortgage.

8

There is no indication that the bank based the modification of March, 2010, on a different application than plaintiff's original June, 2009, application. Despite the language of the TPA, plaintiff has plausibly claimed that defendant's behavior on and after September 1, 2009, was inconsistent with a decision to deny her a loan modification.

Defendant's motion to dismiss the § 1691(d)(1) element of plaintiff's ECOA claim is denied.

### B. Specific Rationale for Adverse Action

ECOA requires a creditor to deliver a statement of reasons for taking adverse action against an applicant for credit. 15 U.S.C. § 1691(d)(2). However, adverse action "does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit." 15 U.S.C. § 1691(d)(6). Further, that section does not encompass "any action or forbearance relating to an account taken in connection with inactivity, default, or delinquency as to that account[.]" 12 CFR § 202.2(c)(2)(ii).

An application for a loan modification under HAMP does not implicate the adverse action notice provisions of ECOA. *Davis v. CitiMortgage, Inc.*, 2011 WL 891209, *3 (E.D. Mich.). A HAMP-authorized TPA does not replace a mortgage obligation; instead it merely suspends certain consequences otherwise resulting from the appliant's voluntary default.

The TPA allows a mortgagor to make reduced payments for a three-month trial period; it does not modify the underlying mortgage and its obligations. Instead, the mortgagor incurs a voluntary and short-term default in exchange for an evaluation that may or may not result in a permanent modification. To avoid sending a precariously situated mortgagor over the cliff of foreclosure, the bank promises either to avoid or suspend foreclosure proceedings, and allow the

9

applicant to amortize the deficiency by tacking the unpaid balance onto the rest of her mortgage. "[B]y alleging that she paid reduced monthly payments under the Trial Plan, Plaintiff admits that she was not current on her mortgage loan[.]" *Davis*, *supra*, 2011 WL 891209, at *3.

Plaintiff voluntarily incurred a default by entering into the TPA with defendant. Section 1691(d)(6) relieves defendant of any obligation under § 1691(d)(2) to deliver a statement of reasons for its adverse credit action.

Defendant's motion to dismiss the § 1691(d)(2) element of plaintiff's ECOA claim is granted.

## 2. Breach of Trial Period Agreement (Breach of Contract)

Establishing a breach of contract claim under Ohio law requires that a plaintiff demonstrate "the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach." *Garafolo v. Chicago Title Ins. Co.*, 104 Ohio App. 3d 95, 108 (1995).

Plaintiff alleges two breaches of contract, namely that the defendant: first, failed to evaluate her application in the timely fashion promised; and second, charged fees in violation of the TPA.

Defendant argues that federal law completely preempts state regulation of banks administering the HAMP, and so none of Plaintiff's state law claims are viable. I disagree.

### A. Preemption

Federal law may preempt state law by stating so in express terms. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Alternately, a court may find an implied intent to preempt state law:

10

> [F]rom a "scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it," "because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose."

*Pac. Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 204 (1983).

Implied preemption includes both field preemption, *i.e.*, "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it[,]" and conflict preemption, *i.e.*, "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Reardon*, *supra*, at 342 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)).

Defendant, citing the proposition that "federal control shields national banking from unduly burdensome and duplicative state regulation", *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007), argues that plaintiff cannot advance state law contract claims against a national bank. According to defendant, HAMP, when combined with the National Banking Act, would preempt any state law contract claim relating to or arising from HAMP.

It is a longstanding principle that "[f]ederally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the [National Banking Act]." *Id*. (citing *Davis v. Elmira Savings Bank*, 161 U.S. 275, 290 (1896)).

11

Under 12 C.F.R. § 34.4(b), the National Banking Act expressly countenances the exposure of national banks to state contract law claims:

> State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers:
>
> (1) Contracts;
>
> (2) Torts;
>
> (3) Criminal law;
>
> (4) Homestead laws specified in 12 U.S.C. 1462a(f);
>
> (5) Rights to collect debts;
>
> (6) Acquisition and transfer of real property;
>
> (7) Taxation;
>
> (8) Zoning; and
>
> (9) Any other law the effect of which the OCC determines to be incidental to the real estate lending operations of national banks or otherwise consistent with the powers and purposes set out in § 34.3(a). .

To be sure, "it is well established that there is no private cause of action under HAMP." *Coulibaly supra*, 2011 WL 3476994, at *15. Plaintiff's contract law claims do not, however, find their foundation in promulgated HAMP guidelines, or from any federal law. They arise from protections the state of Ohio has afforded to its citizens in their contractual dealings with other persons and entities. No part of HAMP expressly preempts the exercise of state law relating to contracts. Likewise, Congress has not indicated that HAMP thoroughly occupies the field of mortgage lending. Simultaneous compliance with federal and state law, moreover, is not a physical impossibility. *See Olivares v. PNC Bank,* 2011 WL 4860167, *4 (D. Minn. 2011).

HAMP does not preempt independent state law contract claims against HAMP participants.

## B. Failure to Evaluate

Plaintiff had no contractual guarantee of a permanent modification once the term of the TPA came to an end. Courts across the country have unanimously agreed that "a defendant's failure to provide a permanent loan modification solely on the basis of the existence of a TPP does not sufficiently state a breach of contract claim."[4] *Lonberg v. Freddie Mac*, 776 F.Supp.2d 1202, 1209 (D. Or. 2011).

Plaintiff has, however, plausibly pled the existence of a separate binding contractual agreement in the TPA, in which defendant promised to: 1) send written notice if she did not qualify for a permanent modification; 2) notify her by September 1, 2009, of its decision; 3) avoid or cease any and all foreclosure-related activity; and 4) waive any and all late fees arising from the arrangement.

Defendant argues that the end of the ninety-day term of a TPA is a self-contained and an inherent decisional apparatus. In the bank's view, either an applicant receives an executed TPA and permanent modification, thereby manifesting a "yes", or nothing else happens, manifesting a "no".

The prospect of 'nothing else' serving as sufficient notification of a negative decision would mean that a vast array of potential actions (or even utter inaction) would serve to notify an applicant of a negative decision. There is a point, however, where an applicant, regardless of his or her vigilance, would be unlikely to understand that a form of action or inaction constituted a decision on her application. Plaintiff has plausibly pled that she reached, if not went well passed that point.

---

[4] A "TPP" is the same sort of agreement as this case's TPA.

13

From June through August, 2009, plaintiff paid her TPA payments on time and in full. On September 1, 2009, defendant had two options under the contract.

The first was to extend a formal loan modification to plaintiff, and proceed to gather such information as it needed to effect the modification. The second was in some manner to deny the application for a modification. On making that decision, if it did so, the bank could demand plaintiff's regular mortgage payment or whatever payment was due under the original mortgage, as affected by the TPA.

Defendant instead chose a third option: demanding the reduced payment under the TPA for two months, then entering into the TFA for three months, then continuing the latter Agreement's payments for two more months, finally deciding in March, 2010, to modify plaintiff's loan. The plaintiff contends, and I find it plausible, that defendant rendered no decision during the initial period of the TPA, and instead kept the plaintiff in limbo for the better part of six months.

In response, the defendant advances a "greater includes the lesser" argument. If defendant was not required to provide a modification, how could it be required to evaluate her application for her modification? The answer is rather straightforward: defendant's minimum obligation under the TPA was to provide some response in writing indicating its decision on the application. An obligation to provide a decision indicates an obligation to decide, however that decision was made.

The viable claim here is thus not the defendant's failure to provide a modification (for the plaintiff was not entitled to that), but the defendant's failure to provide a decision in a timely fashion.

### C. Fees and Timely Application of Payments

14

Plaintiff claims that defendant breached the TPA by charging late fees in violation of the agreement, and by misapplying plaintiff's payments so as to accrue interest charges. At issue are the May 25, 2010, $6,560.12 "Non Cash Adjustment" and the May 26, 2010, $1,351.60 "Corporate Advance Adjustment".

Defendant argues that it reversed all items labeled on plaintiff's Activity Statement as "late fees.". While true, this does not address the $1,351.60 fee balance that persisted at least until the time of this suit's filing.

The statement gives no indication as to what the fee balance is for. The figure appears in the same column in the same fashion as the reversed late fees. It is also in close temporal proximity to the last charge reversed per the TPA guidelines, coming only two days after the last reversal.

As the facts currently stand, it is plausible that the fee balance in question related to a late payment while the TPA governened her payments. The labeling of the May 26, 2010, adjustment/fee is so opaque and in such close proximity to the series of cleanup transactions that accompanied plaintiff's transition out of the TPA that the two could be plausibly connected.

Plaintiff also argues that defendant misapplied her loan payments at least once. This occurred, plaintiff claims, when defendant reversed a payment on May 20, 2010. Defendant argues that this reversal does not breach any provision of any contract between it and plaintiff.

Under the TPA defendant had to hold plaintiff's payments until she had sufficient funds to pay her full and regular mortgage payment, and then to apply those funds to her oldest delinquent payment. Defendant did so through at least February, 2010. The reversed May 12, 2010, payment was identical to the seven prior applications of TPA funds to delinquent payments, and included a late charge that the bank subsequently reversed, as it had prior late fees assessed while plaintiff's

15

mortgage was under the TPA. It is plausible that this charge was a required TPA application of funds by the defendant, and that the bank erroneously mishandled the transaction..

It is likewise plausible that, had defendant delivered a decision on or by September 1, 2010, plaintiff's deficiency would have been smaller than it was on May 25, 2010, when the bank added an accumulated deficiency of $6,560.12 to her mortgage.

I grant defendant's motion to dismiss with respect to any claim for entitlement to a loan modification and deny with respect to all other breach of contract claims the plaintiff alleges.

### 3. Negligent and Intentional Misrepresentation

Plaintiff asserts claims of negligent and intentional misrepresentation against defendant.

### A. Negligent Misrepresentation Claim

To state a claim for negligent misrepresentation in Ohio, a plaintiff must plead a breach of the duty described in *Delman v. Cleveland Hts*, 41 Ohio St.3d 1, 4 (1989):

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"A core requirement in a claim for negligent misrepresentation is a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transaction." *Ford v. New Century Mortg. Corp.*, 797 F.Supp.2d 862, 872 (N.D. Ohio 2011) (quoting *Hayes v. Computer Assocs. Intern., Inc.*, 2003 WL 21478930, at *6 (N.D.Ohio 2003) (further citations omitted)). The relationship between a bank as creditor and its debtor does not, without more, "give rise to the existence of a duty necessary to maintain a negligent misrepresentation

16

claim." *Id.*, citing *425 Beecher, L.L.C. v. Unizan Bank, Natl. Assn.*, 186 Ohio App.3d 214, 230 (2010).

Lacking any evidence of a duty on the part of the defendant to the plaintiff that would suffice to maintain a negligent representation claim, I dismiss.

### B. Intentional Misrepresentation Claim

In Ohio, a claim for intentional misrepresentation requires plaintiff plead:

> (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance.

*Ford*, *supra*, 797 F.Supp.2d at 873 (citing *Fifth Third Bank v. Cope*, 162 Ohio App.3d 838, 848 (2005)).

Defendant argues this claim should likewise fail, as it owed no duty to plaintiff beyond its creditor/debtor relationship with her. Were plaintiff arguing that defendant concealed a fact, she would need to prove a duty to disclose; the representation of a fact requires no such duty. *Funk v. Durant*, 155 Ohio App.3d 99, 103 (Ohio App. 5 Dist. 2003); *see also Mancini v. Gorick*, 41 Ohio App.3d 373, 374 (1987).

Plaintiff has plausibly argued at least one affirmative misrepresentation - that no fees would be charged - and linked this misrepresentation to an injury: the fee levied against her account on May 26, 2010.

I grant defendant's motion to dismiss with respect to plaintiff's negligent misrepresentation claim, and deny with respect to plaintiff's intentional misrepresentation claim.

### 4. Promissory Estoppel

17

Plaintiff alleges defendant made two unambiguous promises and failed to keep both; namely that it would: 1) waive any and all late fees incurred as a result of participation in the HAMP program upon plaintiff's successful completion of the TPA; and 2) provide a decision on her application by September 1, 2009. Defendant argues it waived all late fees and made no such promise about making a decision.

Promissory estoppel is a quasi-contractual claim for equitable relief. *HAD Ents. v. Galloway*, 948 N.E.2d 473, 481 (Ohio App. 2011). The elements of promissory estoppel are "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance[.]" That promise "is binding if injustice can be avoided only by enforcement of the promise." *McCroskey v. State*, 8 Ohio St.3d 29, 30 (1983) (citing Rest. 2d of Contracts, § 90). "In order to prevail on a claim of promissory estoppel, appellant must show a clear and unambiguous promise and reliance by the party to whom the promise is made. The reliance must be reasonable and foreseeable, and the party relying on the promise must have been injured by the reliance." *Galloway*, *supra*, 948 N.E.2d at 481.

Under Ohio law, a quasi-contract is a contract implied in law, absent an express written agreement between parties. *Hummel v. Hummel*, 133 Ohio St. 520, 525–528 (1938); *see also Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F.Supp.2d 899 (S.D. Ohio 2009). A party may plead promissory estoppel in the alternative to a claim for breach of a written agreement. A plaintiff cannot, however, use the oral agreement on which she supports her promissory estoppel claim to alter the terms of a written agreement. *Lippert v. Univ. of Cincinnati*, 1996 WL 566012, *4 (Ohio App.). When the promises serving as the basis of the promissory estoppel claim do not contradict

18

the written agreement, the claim may survive. *See Miller v. Lindsay-Green, Inc.*, 2005 WL 3220215, *10 (Ohio App.).

Plaintiff and defendant agree that they had a written contractual agreement with each other from June, 2009, through September 1, 2009. After September 1, 2009, their relationship consisted largely of instructions, some telephonic and some written, from the defendant to the plaintiff to pay certain amounts on certain dates. Those instructions contained no written indication as to which, if any, agreement governed the determination of the amounts plaintiff had to pay.

The parties also entered into the separate TFA from October, 2009, to December, 2009. It, much like the TPA, eventually fell into a contractual limbo wherein the plaintiff waited until defendant instructed her, with little or no apparent written instructions, what payments to make on a month-to-month basis.

Plaintiff's claim of promissory estoppel regarding the promise not to charge fees is not, therefore, based on the written agreement between them as of the Summer of 2009. Instead, plaintiff has plausibly derived this claim from the implied and non-written continuation of the agreement between September, 2009, and May, 2010. The bank assessed plaintiff a fee, still on her account, that could derive from the months she spent in a quasi-contractual agreement with defendant. This suffices as a form of detrimental reliance.

Plaintiff, however, bases her promissory estoppel claim regarding the promise to provide a timely decision on a written agreement. The initial TPA period was to last from June 1, 2009, until ninety days from then, or September 1, 2009. Plaintiff has not pled the existence of an alternative non-written agreement during that period. The existence of a written contract covering a certain

19

subject matter precludes a promissory estoppel claim for prior non-written agreements covering that same subject matter. *See Gallant v. Toledo Pub. Sch.*, 84 Ohio App.3d 378, 386 (1992).

I grant defendant's motion to dismiss with respect to plaintiff's promissory estoppel claim regarding the promise to provide a decision by September 1, 2009 and deny with respect to plaintiff's claim regarding the promise to refrain from charging fees.

### 5. Unjust Enrichment

Plaintiff alleges a claim of unjust enrichment based on the fees defendant purportedly applied to her account. Defendant argues that this claim should be dismissed, as the Note and the Mortgage govern the entire relationship between the parties.

Unjust enrichment is an equitable doctrine, allowing a court to imply a "quasi-contract" wherein a party "retains money or benefits which in justice and equity belong to another." *MVB Mortg. Corp. v. F.D.I.C.*, 2010 WL 654051, *3 (S.D.Ohio) (quoting *Hummel, supra*, 133 Ohio St. at 525-28 (1938)).

Like the promissory estoppel claims discussed *supra*, unjust enrichment claims may be pled in the alternative to a breach of contract claim when the existence of a contract is in dispute. *See Resource Title Agency, Inc. v. Morreale Real Estate Servs.*, 314 F. Supp.2d 763, 772 (N.D. Ohio 2004). As I discussed previously, the existence of a written contract governing part or all of the parties' relationship between September, 2009, and May, 2010, is in dispute, and a fee balance persists on plaintiff's account. The provenance and purpose of that balance are plausibly related to the alleged quasi-contractual relationship.

I deny defendant's motion to dismiss plaintiff's unjust enrichment claim.

### 6. Conversion

20

Plaintiff alleges a claim for conversion for misappropriation of her payments into payments for fees and other unspecified purposes. Defendant claims that plaintiff has not sufficiently pled a claim for conversion of money and, additionally, that my decision in *Anderson v. Barclays Capital Real Estate, Inc.*, 2010 WL 2541807 (N.D. Ohio), on which plaintiff bases her claim, was erroneously decided.

Under Ohio law, "a cause of action for conversion arises where a defendant: (1) wrongfully exercises dominion or control; (2) over the property of the plaintiff; and, (3) in a manner inconsistent with plaintiff's rights of ownership." *Dawes v. BAC Home Loans Servicing Corp.*, 2011 WL 2559410, *9 (N.D. Ohio). "A plaintiff can maintain a claim for conversion of money if the funds are specifically identified, are held in trust, or are withheld by a person owing a fiduciary duty to the plaintiff." *Id.* "[W]here there is only a relationship of debtor and creditor, not an obligation to return identical money, an action for conversion of the funds representing the indebtedness will not lie against the debtor." *NPF IV, Inc. v. Transitional Health Servs.*, 922 F.Supp. 77, 82 (S.D.Ohio 1996).

Plaintiff argues that she had a fiduciary or trust relationship with defendant. Defendant was obligated to hold her payments until they totaled a full payment under the obligations of her original mortgage, and then apply those payments to her account. A fiduciary agreement is a bilateral agreement between parties to enter into a special and confidential relationship, where one places trust in the integrity and fidelity of another, thereby giving the other control and influence over his designated affairs. *See Cairns v. Ohio Sav. Bank,* 672 N.E.2d 1058, 1061-62 (Ohio App. 1996) (citations omitted).

The relationship between plaintiff and defendant is that of creditor and debtor, and there is no indication that the parties agreed to a fiduciary relationship, whether through express contract or

through the defendant's assumption of fiduciary duties at plaintiff's request. A claim for conversion of the otherwise fungible funds used to pay plaintiff's mortgage obligation requires a relationship beyond the one at work here, and plaintiff has not sufficiently pled the existence of that relationship.[5]

I grant defendant's motion to dismiss plaintiff's claim for conversion.

## CONCLUSION

For the foregoing reasons, it is hereby:

ORDERED THAT:

1.    Defendant's motion to dismiss [Doc. 4] be, and the same hereby is granted as to plaintiff's adverse action notice claim, breach of contract claim for an entitlement to a loan modification under HAMP, negligent misrepresentation claim, promissory estoppel claim for a decision by September 1, 2009, and conversion claim.

2.    Defendant's motion to dismiss be, and the same hereby is denied as to all other claims by plaintiff.

3.    A scheduling conference is set for February 13, 2012 at 2:00pm. Out of town counsel may participate by phone.

---

[5] I differentiate this case from my holding in *Anderson*. In that case, the defendant, a mortgage servicer, argued that its misapplication of payments to the plaintiff debtor's account did not constitute conversion because plaintiff had no right to possess the funds once she made her payment. *Anderson*, *supra*, 2010 WL 2541807, at *3. Ruling on a Fed. R. Civ. P. 12(b)(6) motion to dismiss, I found plaintiff sufficiently alleged that defendant wrongfully exercised dominion over her property. *Id.* at *4.

As I stated in that opinion, "all that matters is what plaintiff has asserted in her complaint – not what she can or may 'demonstrate' once discovery occurs." *Id.* Plaintiff alleged a claim for conversion, and based on the arguments presented in that case, she raised the possibility of her right to relief above the speculative level, as *Twombly* requires.

So ordered.

s/James G. Carr
Sr. United States District Judge